# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

FREDERICK C. CASHNER,           )
                                )
Plaintiff,                      )
                                )
vs.                             )     CAUSE NO. 3:14-CV-1641
                                )
JOHN J. WIDUP, *et al.*,        )
                                )
Defendants.                     )

## OPINION AND ORDER

This matter is before the Court on: (1) Defendant John Widup's Motion for Summary Judgment (DE #64); and (2) Defendants Dr. Al-Shami and Kimberly White's Motion for Summary Judgment (DE #66), both filed on March 28, 2016. For these reasons the Court:

(1) **GRANTS** the defendants' motions for summary judgment (DE ##64, 66);

(2) **DISMISSES with prejudice** Plaintiff's federal claims;

(3) **DISMISSES without prejudice** Plaintiff's state law claims; and

(4) **ORDERS** the clerk to enter judgment in favor of the defendants consistent with this order and close this case.

BACKGROUND

Frederick C. Cashner, a *pro se* prisoner, is proceeding in this case against Dr. Nadir Al-Shami, Nurse Kimberly White, and Warden John J. Widup[1] for denying him proper medical treatment

---

[1] In their individual capacities for monetary damages. (DE #1 at 5.)

for chronic headaches while he was a pretrial detainee at the Porter County Jail between March 2011 to February 2013. He concedes that he received treatment for chronic headaches, but complains that the treatment provided was not effective.

In his motion for summary judgment, Warden Widup argues that he had no personal involvement in Cashner's medical care and, therefore, the claims against him must be dismissed. In the medical defendants' motion for summary judgment, Dr. Al-Shami and Nurse White argue that the medical care rendered to Cashner was adequate and within the applicable standard of care. Cashner was provided with a "Notice of Summary Judgment Motion" as required by N.D. Ind. L.R. 56-1 and a copy of both Federal Rule of Civil Procedure 56 and Local Rule 56-1. (DE ##63, 69.) That notice clearly informed him that unless he disputed the facts presented by the defendant, the court could accept those facts as true. Fed. R. Civ. P. 56(e) ("If a party . . . fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion."). It also told him that unless he submitted evidence creating a factual dispute, he could lose this case. Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). Cashner has filed his response.

DISCUSSION

Summary Judgment Standard

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In determining whether summary judgment is appropriate, the deciding court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). "However, our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (citing *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)).

Facts

On April 25, 2011, Cashner was booked into the Porter County Jail. (DE #68-2 at 3.) At this time, Advance Correctional

Healthcare ("ACH") provided inmate medical services at the jail. (DE #65-1.) Between April 2011 and December 31, 2012, Registered Nurse Kimberly White and several other nurses were assigned to work at the jail. (DE #65-2 ¶ 4; DE #68-1 ¶ 2.) In addition, Dr. Nadir Al-Shami and two other physicians were assigned to work there. (*Id.*) During his incarceration, John Widup was the Warden of the Porter County Jail. (DE #65-2 ¶ 3.) He was charged with overseeing general day-to-day operations. (*Id.*) He typically deferred to the jail's medical staff for all inmate medical matters. (*Id.* at ¶ 6.)

Cashner's medical history at the jail is lengthy, well-documented and largely undisputed. On August 13, 2011, Cashner submitted a Medical Request Form, complaining that he had been having headaches every day. (DE #68-4 at 174.) Cashner reported that the headaches began after he was taken off his blood pressure medication and that Ibuprofen was not relieving the headaches. (*Id.*) Dr. John Collier examined Cashner on August 16, 2011, and diagnosed him with headaches with hypertension and prescribed Tylenol. (DE #68-2 at 17.) Dr. Collier also ordered medical staff to monitor Cashner's blood pressure and headache patterns. (*Id.*) On August 23, 2011, Dr. Wes Harmston examined Cashner. (Ex. #68-2 at 18.) Cashner reported migraines that occurred first thing in the morning. (*Id.*) Dr. Harmston continued

the Tylenol prescription and ordered Cashner to avoid caffeine and carefully observe his head position. (*Id.*)

On September 2, 2011, Cashner submitted a Medical Request Form indicating that his headaches were continuing. (DE #68-4 at 173.) Cashner requested a re-examination of his headaches, which had worsened since his Tylenol had been reduced to once daily. (*Id.*) On September 6, 2011, Dr. Harmston reviewed Cashner's medical chart and prescribed Tylenol twice daily. (*Id.* at 141.) On September 7, 2011, Cashner submitted a Medical Request Form indicating that he would like to speak with Kimberly House about his ongoing medical problems. (*Id.* at 172; DE 68-1 ¶ 7.) On September 8, 2011, Nurse White responded that she would place Cashner on the list to see the doctor, and she also offered daily nursing services by the nurse on duty. (*Id.*) On September 13, 2011, Dr. Harmston examined Cashner, where he reported persistent headaches, unchanged on his prescribed regimen of Tylenol. (DE #68-2 at 19.) Dr. Harmston indicated that he would refer Cashner to a neurologist for his migraine headaches. (*Id.*) Dr. Harmston also prescribed a stronger dose of Tylenol as needed and Naprosyn as needed. (*Id.*) On September 14, 2011, Nurse White spoke with Dr. Harmston, and Dr. Harmston indicated that Cashner's neurology consultation would be discontinued and that Dr. Harmston would re-evaluate Cashner on September 20, 2011. (DE #68-1 ¶ 8.) On September 16, 2011, Nurse White spoke with Cashner and informed

him of Dr. Harmston's decision to discontinue Cashner's neurology consult and to instead re-evaluate Cashner on September 20, 2011. (DE #68-3 at 140; DE #68-1 ¶ 9.) During this conversation, Cashner indicated that his new medication was helping with his headaches. (*Id.*) Cashner also indicated that he had experienced chronic headaches approximately 10 years prior due to a problem with his cervical spine. (*Id.*)

On September 20, 2011, Dr. Harmston re-evaluated Cashner. (DE #68-2 at 20.) Cashner reported chronic headaches for the past month. (*Id.*) Cashner also reported a photophobia caused by a pain in his neck that radiated to the back of his head. (*Id.*) Dr. Harmston diagnosed migraine headaches versus tension-related headaches. (*Id.*) Dr. Harmston prescribed Fioricet as needed for 14 days and Flexeril 10 mg for 14 days. (*Id.*) On September 21, 2011, Nurse White spoke with Cashner to inform him that, because Dr. Harmston had prescribed certain medications (Flexeril and Fioricet), Warden John Widup wanted Cashner moved to medical isolation. (DE #68-3 at 139; DE #68-1 ¶ 10.) Cashner refused to be moved to medical isolation and stated, "I'm not going to move where there is no TV." (*Id.*) Nurse White educated Cashner regarding his recurrent headaches and the need to take his medications as prescribed. (*Id.*) On September 25, 2011, Cashner submitted a Medical Request Form asking to speak to the doctor about his ongoing headaches and his treatments and prescriptions.

(DE #68-4 at 171.) On September 27, 2011, Dr. Harmston examined Cashner, where he reported headaches, which had improved. (DE #68-2 at 21.) Cashner also indicated that he did not want to be confined to medical isolation, as he was claustrophobic. (*Id.*) Cashner inquired whether Imitrex would be allowed in general population. (*Id.*) On September 28, 2011, Nurse White responded that Imitrex would be allowed if Cashner moved to medical isolation for close observation, per Warden Widup. (DE #68-1 ¶ 11.)

On October 2, 2011, Cashner submitted a Medical Request Form asking to speak with the doctor about the change in his prescription for his headaches. (DE #68-4 at 170.) October 10, 2011, Dawn Martin, L.P.N. examined Cashner. (DE #68-3 at 138.) Cashner indicated that he was doing okay and had no complaints. (*Id.*) Dr. Harmston examined Cashner later that day, where he reported headaches, but indicated that his Imitrex prescription had been helping. (DE #68-2 at 22.) Dr. Harmston prescribed another round of the Butalbital and Flexeril regimen and discontinued Tylenol. (*Id.*) On October 11, 2011, Nurse Martin examined Cashner. (DE #68-3 at 138.) Cashner complained of not receiving his medications 4 times daily, and Nurse Martin explained the as-needed nature of his medications, *i.e.*, if Cashner did not complain of or have a headache, he would not receive his medication. (*Id.*) On the morning of October 12, 2011,

Cashner again expressed his frustration over not receiving his Fioricet every six 6 hours. (*Id.*) Nurse Walker informed Cashner that his as-needed medications were only to be administered for complaints of a significant headache. (*Id.*) Cashner continued to insist that he should receive his medications on a set schedule, and Nurse Walker again educated him on the parameters of his as-needed medications. (*Id.*) That night, Nurse Martin examined Cashner, where he complained of headaches that were constant and not relieved by his medications. (*Id.*) Nurse Martin administered Cashner's medications and discharged him to his housing unit. (*Id.*)

On the morning of October 13, 2011, Cashner reported to nursing staff that his headache was worse than what it had been previously. (DE #68-3 at 137.) Nursing staff administered Cashner's medications as prescribed. (*Id.*) That evening, Cashner again reported to nursing staff that his headache had returned. (*Id.*) Cashner indicated that he took Motrin in addition to his prescription medications that morning. (*Id.*) Nurse Walker explained to Cashner that his prescription medications were to be administered on an as-needed basis and sent Cashner back to his housing unit. (*Id.*) On the morning of October 14, 2011, Cashner took his medications as prescribed, but indicated that his medications were not working to relieve his headaches. (*Id.*) Cashner requested to see a specialist and signed a Refusal Form

for his Flexeril and Fioricet. (*Id.;* DE #68-2 at 23.) Cashner submitted a Medical Request Form indicating that the medication prescribed by Dr. Harmston was not working and that his headaches continued. (DE #68-4 at 169.) Cashner expressed that he would like testing or treatment to determine the cause of his headaches. (*Id.*) Nursing staff advised Cashner that he was scheduled to see Dr. Harmston and returned Cashner to general population. (DE #68-3 at 137.)

On October 16, 2011, Cashner indicated to nursing staff that he would like to restart his Flexeril and Fioricet. (DE #68-3 at 136.) Dr. Harmston prescribed Flexeril and Fioricet. (*Id.*) Cashner later reported to nursing staff that he had a headache, and nursing staff administered his medications. (*Id.*) On October 17, 2011, Nurse White and Warden Widup met with Cashner to educate him on the meaning and purpose of his medications being prescribed "as needed," since he had previously complained that his medications were not delivered on a set schedule. (DE #68-1 ¶ 12; DE #65-2 ¶¶ 5, 9.) Cashner verbalized his understanding, and Nurse White informed Dr. Harmston of the conversation and education provided. (*Id.*) Dr. Harmston examined Cashner later that day, where he reported continued headaches and expressed concerns about his medications being administered as needed. (DE #68-2 at 24.) Cashner told Dr. Harmston that he thought that he needed his medications on a set schedule. (*Id.*) Dr. Harmston

altered Cashner's medication regimen as follows: Butalbital twice daily (instead of as needed); and Flexeril once daily for one 1 week. (*Id.*) Dr. Harmston also prescribed Naprosyn twice daily as needed. (*Id.*) On October 18, 2011, Nurse Martin observed Cashner in his cell listening to music on his headphones very loudly. (DE #68-3 at 136.) Nurse Martin indicated that she could hear the music while checking on other inmates in medical isolation. (*Id.*) Cashner later reported to nursing staff that he had a headache. *(Id.)* After examination, Cashner indicated that his headache was much improved. (*Id.*) That same day, Dr. Harmston changed Cashner's Naprosyn prescription from 325 mg to 375 mg. (DE #68-3 at 134.) On October 19, 2011, Nurse Martin examined Cashner, where he complained of a headache, but that it was much better than before. (*Id.*) Nurse Martin administered Cashner's medications. (*Id.*) On October 20, 2011, Cashner told nursing staff that his medication was working to alleviate his headaches. *Id.* Cashner did express, however, that he wanted to discuss a change of his medications and that he wanted out of medical isolation. (*Id.*) On October 21, 2011, Nurse Martin examined Cashner, where he reported a headache, but that it was much better than before. (*Id.*)

On October 22, 2011, Cashner denied any headaches and told nursing staff that his headache medications were working. (DE #68-3 at 134.) On the morning of October 23, 2011, Cashner denied

any headaches and again indicated that his headaches had
dissipated since Dr. Harmston prescribed his most recent regimen
of medications. (*Id.*) Later that day, however, Cashner reported
to nursing staff that he had a headache and had taken Motrin to
try to ease his pain. (DE #68-3 at 133.) Cashner indicated that
the Motrin helped and that his headache went away. (*Id.*) Nurse
Walker observed Cashner listening to his headphones loudly. (*Id.*)
On October 24, 2011, Dr. Harmston examined Cashner. (DE #68-2 at
25.) Cashner indicated that he would like to take NSAIDs for his
headaches. (*Id.*) Dr. Harmston ordered continuous monitoring of
Cashner's blood pressure and prescribed Naprosyn 875 mg twice
daily for 14 days. (*Id.*) Dr. Harmston discontinued Cashner's
Ibuprofen and Flexeril and instructed Cashner to follow up in 2
weeks. (*Id.*) On October 31, 2011, Dr. Harmston again examined
Cashner and prescribed Propranolol and ordered Cashner's Naprosyn
continued. (*Id.* at 26.) Dr. Harmston also ordered continuous
monitoring of Cashner's blood pressure and instructed him to
return if his symptoms worsened. (*Id.*)

On November 14, 2011, Dr. Harmston examined Cashner. (*Id.* at
27.) Dr. Harmston found Cashner to have elevated blood pressure
and headaches. (*Id.*) Dr. Harmston also noted that Cashner had
been tolerating his Propranolol well. (*Id.*) Dr. Harmston
increased Cashner's Propranolol to 80 mg twice daily to lower his
blood pressure. (*Id.*) Dr. Harmston also ordered Cashner's

Naprosyn continued and that nursing staff monitor Cashner's blood pressure daily for 14 days. (*Id.*)

On December 1, 2011, Cashner submitted a Medical Request Form requesting follow up regarding the recent change in his blood pressure medication and to discuss his headaches that had returned. (DE #68-4 at 168.) On December 5, 2011, Dr. Harmston examined Cashner, where he complained of adverse side-effects to his Propranolol. (DE #68-2 at 28.) Dr. Harmston prescribed Metoprolol and discontinued Propranolol. (*Id.*) Dr. Harmston also ordered that nursing staff monitor Cashner's blood pressure daily for 2 weeks. (*Id.*) On December 10, 2011, Cashner submitted a Medical Request Form indicating that he was experiencing headaches and other adverse side-effects to his Metoprolol and requesting to speak with the doctor about changing his blood pressure medication. (DE #68-4 at 167.) On December 19, 2011, Dr. Harmston examined Cashner and noted that Cashner attributed his headaches to his beta blocker blood pressure medication. (DE #68-2 at 29.) Dr. Harmston discontinued Cashner's Metoprolol and prescribed Norvasc. (*Id.*)

On February 7, 2012, Cashner signed a Refusal Form for his Norvasc. (*Id.* at 30.) On February 14, 2012, Cashner submitted a Medical Request Form asking that the doctor extend his Naprosyn prescription for his headaches. (DE #68-4 at 166.) Cashner indicated that the Naprosyn had been working to relieve his

headaches. (*Id.*) Nurse Walker responded to Cashner's request the next day and indicated that the doctor would renew his Naprosyn prescription. (*Id.*)

On May 6, 2012, Cashner submitted a Medical Request Form asking to speak with the doctor about further testing or treatment related to his headaches. (*Id.* at 164.) Cashner indicated that his Naprosyn, which he had been taking for 7 months, was providing at least some relief, but that he still experienced headaches. (*Id.*) On May 8, 2012, Nurse Martin examined Cashner. (DE #68-3 at 133.) Nurse Martin noted that Cashner was doing well on his medications, and Dr. Harmston submitted a telephone order to continue them. (*Id.*) On May 14, 2012, Dr. Harmston examined Mr. Cashner, where he reported elevated blood pressure and off-and-on headaches. (DE #68-2 at 33.) Cashner also indicated that he was taking his Naprosyn as prescribed for his headaches. (*Id.*) Cashner told Dr. Harmston that he had been headache-free on Naprosyn, but that he recently had been experiencing headaches more frequently. (*Id.*) Dr. Harmston ordered that nursing staff monitor Cashner's blood pressure weekly and prescribed Fioricet, but Cashner declined this medication. (*Id.*) Dr. Harmston alternatively ordered that Cashner continue on his Naprosyn and also referred him for an

outside consultation for a neurology evaluation.[2] (*Id.*) Pursuant to Dr. Harmston's orders, Nurse Kim White scheduled Cashner for a neurology consultation with Dr. Vyas. (DE #68-1 ¶ 13.)

On May 23, 2012, Cashner submitted a Medical Request Form indicating that his headaches were still frequently occurring. (DE #68-4 at 163; DE #68-1 ¶ 14.) Cashner inquired as to whether he was scheduled to see a specialist for further treatment of his headaches. (*Id.*) Nurse White responded that Cashner had been scheduled for a neurology evaluation. (*Id.*) Nurse White also inquired as to whether Cashner wanted to reconsider his having declined Fioricet at his May 14, 2012 visit with Dr. Harmston. (*Id.*)

On June 14, 2012, Cashner submitted a Medical Request Form indicating that his headaches were occurring more frequently and more painfully than previous headaches. (DE #68-4 at 162; DE #68-1 ¶ 15.) Cashner expressed interest in interim treatment until he could consult with a specialist. (*Id.*) Nurse White responded and informed Cashner that medical staff had scheduled an appointment with a specialist and that Cashner had declined Fioricet, which

---

[2] Cashner attempts to embellish this by claiming that Dr. Harmston "announced that he had done all he could do to control my headaches and stated that it was his recommendation that I see a specialist." (DE #70-2 ¶ 5.) This evidence, if admissible, would have nominal value in this case. But, nevertheless, as the defendants correctly point out, this purported statement made by non-party is inadmissible hearsay, FED. R. EVID. 802, not subject to any hearsay exception. FED. R. EVID. 803, 807. As a result, it cannot be used as evidence to defeat a motion for summary judgment. *Smith v. Dunn*, 368 F.3d 705, 709 (7th Cir. 2004).

Dr. Harmston had attempted to prescribe on May 14, 2012. (*Id.*) Nurse White again offered Cashner Fiorcet. (*Id.*) Nurse Martin examined Cashner later that day. (DE #68-3 at 132.) Nurse Martin noted that Cashner was doing well on his medications and that he was not experiencing any adverse side-effects. (*Id.*) Dr. Collier submitted a telephone order for Diltiazem and Naprosyn. (*Id.*) On June 18, 2012, Cashner submitted a Medical Request Form denying that he ever declined Fioricet and that he instead declined to be placed in medical isolation in order to take Fioricet. (DE #68-4 at 161; DE #68-1 ¶ 16.) Cashner requested Flexeril and Naprosyn until he could be seen by a specialist. (*Id.*) Nurse White responded the following day that Cashner had been offered appropriate medical treatment, but that he had refused and denied himself such treatment. (*Id.*) Nurse White also indicated that the medical provider dictates treatment options. (*Id.*) On June 20, 2012, Cashner submitted a Medical Request Form asking for an explanation as to the appropriate medical treatment that he had refused. (DE #68-4 at 160; DE #68-1 ¶ 17.) Cashner again asserted that he had not refused to take Fioricet, but had refused to be placed in medical isolation to take Fioricet. (*Id.*) Nurse White responded that Cashner had refused Fioricet and also indicated that medical staff had scheduled Cashner for an outside neurology evaluation. (*Id.*) On June 25, 2012, Cashner submitted a Medical Request Form asking to speak to "a different doctor" than whom

Cashner had seen previously and whom "may have some knowledge" that "the other doctor doesn't." (DE #68-4 at 159.) Nurse Walker responded the following day that every doctor at the Porter County Jail follows the same protocols and procedures and that Cashner would be able to discuss his headaches with the neurologist in several days. (*Id.*) Cashner had an appointment to see Dr. Vyas, the neurologist, on June 28, 2012. (DE #68-1 ¶ 32.) However, officers were not able to transport him to that appointment due to a staff shortage and an emergency in the jail that day. (*Id.;* DE #65-2 ¶ 13) Nurse Kim White was not responsible for transporting Cashner to this appointment. (*Id.*) Cashner's appointment with Dr. Vyas was re-scheduled for the next available date. (DE #65-2 ¶ 13.)

On July 1, 2012, Cashner submitted a Medical Request Form asking to see the doctor. (DE #68-4 at 158.) Nurse White responded the following day that she had referred Cashner's request to the doctor. (*Id.*) On July 2, 2012, after being gone from the jail for several days, Nurse White was advised that Porter County Jail security staff could not transport Cashner to his outside neurologist consultation on June 28, 2012 due to an emergency in the jail. (DE #68-3 at 132; DE #68-1 ¶¶ 18, 32.) As soon as she was made aware of this, Nurse White rescheduled Cashner's appointment with Dr. Vyas for August 30, 2012 and informed security staff of the scheduling change. (*Id.*) On July

3, 2012, Dr. Collier examined Cashner, where Cashner reported headaches and issues with his blood pressure. (DE #68-2 at 33.) Dr. Collier discontinued Cashner's Naprosyn and prescribed Meloxicam. (*Id.*) On July 6, 2012, Cashner reported to nursing staff that Meloxicam was not relieving his headaches. (DE #68-3 at 131.) Cashner indicated that Naprosyn provided greater relief of his headaches than Meloxicam. (*Id.*) Dr. Collier submitted a telephone order to reinstate Cashner's Naprosyn and to discontinue Meloxicam. (*Id.*)

On July 13, 2012, Cashner submitted a Medical Request Form asking to see the doctor. (DE #68-4 at 157; DE #68-1 ¶ 19.) Nurse White responded by scheduling Cashner with the doctor. (*Id.*) Later that evening, Cashner reported to custody officers during medication distribution with chest pain, a rapid heart rate, a headache, and ringing in his ears. (DE #68-2 at 34-36.) At approximately 7:00 p.m., Officer Brian Lambka checked Cashner's blood pressure with a wrist monitor, which returned a reading of 230/142. (*Id.* at 34.) Officer Lambka instructed Officer June Taylor to contact the shift supervisor, Lieutenant Hunter McKee, to inform Lt. McKee of Cashner's condition. (*Id.*) Officer Taylor contacted Lt. McKee at approximately 8:05 p.m., and Lt. McKee evaluated Cashner. (*Id.* at 35.) Lt. McKee checked Cashner's vitals and noted that his blood pressure had lowered to 194/118. (*Id.*) Cashner informed Lt. McKee that his chest pain was on the

left side of his chest and felt as if his heart was "going to beat out of (his) chest." (*Id.*) Lt. McKee contacted Dr. Nadir Al-Shami to inform him of Cashner's condition. (*Id.*; DE #68-8 ¶ 7.) Dr. Al-Shami was not present at the Porter County Jail on July 13, 2012, but submitted telephone orders for one Nitroglycerin tablet for Cashner's chest pain and continued monitoring of Cashner's condition. (*Id.*) Dr. Al-Shami also instructed the custody officers to contact him if Cashner's condition did not improve. (*Id.*) Lt. McKee again contacted Dr. Al-Shami and informed him that Cashner's pain had not improved. (*Id.*) Dr. Al-Shami submitted telephone orders to administer 325 mg of Aspirin and move Cashner to medical isolation for better observation. (*Id.*) Officer Lambka placed Cashner in medical isolation and told him to inform the custody officers if his pain levels increased. (DE #68-2 at 34-35.)

At approximately 3:30 a.m. on July 14, 2012, Cashner reported chest pain and a rapid heart rate to Corporal Nathan Graf, the custody officer working in Main Control at that time. (*Id.* at 37.) Officer Ramus reported Cashner's elevated blood pressure to Corporal Melana Florer, who contacted Dr. Townsend, another on-call physician. (*Id.*) Dr. Al-Shami was unavailable when custody officers called, and Dr. Townsend was likely the second doctor on the on-call list. (DE #68-6 ¶ 7.) Dr. Townsend submitted a telephone order to transfer Cashner to the Porter

18

Regional Hospital. (DE #68-2 at 37.) At approximately 4:30 a.m. on July 14, 2012, custody officers transferred Cashner to Porter Regional Hospital for his unimproved chest pain. (*Id.*; DE #68-8.) Porter Regional Hospital medical staff performed a coronary CT angiogram, which revealed right coronary artery dominance and normal coronary anatomy without anomaly. (*Id.*) Porter Regional Hospital medical staff interpreted the coronary CT angiogram as normal and ordered a stress test for Cashner in the next 30 days. (*Id.*) Porter Regional Hospital medical staff prescribed Clonidine, Aspirin, and Metoprolol and discharged Cashner to the Porter County Jail. (*Id.*) Upon return from Porter Regional Hospital on July 14, 2012, Nurse Walker examined Cashner, where he denied headaches or problems with his blood pressure. (DE #68-3 at 130.) Nurse Walker indicated that Cashner took his medications and ensured that he remained in medical isolation for observation, per the doctor's orders. (*Id.*) That evening, Cashner reported "bad" headaches*. (Id.)* Nursing staff indicated that Cashner took his medications, but was very upset. (*Id.*) Nursing staff observed no signs or symptoms of acute distress. (*Id.*)

On July 15, 2012, Nurse Walker assessed Cashner in the morning medication pass line. (*Id.*) Cashner voiced no new complaints or complaints of a headache. (*Id.*) Nurse Walker indicated that Cashner took all of his medications and was to remain in medical isolation for monitoring. (*Id.*) At

approximately 5:45 p.m., nursing staff reviewed Cashner's blood
pressure reading from that evening (172/108) with Dr. Al-Shami.
(DE #68-3 at 129; DE #68-6 ¶ 8.) Based upon Cashner's elevated
blood pressure reading, Dr. Al-Shami submitted a telephone order
for a trial dose of Lisinopril 40 mg to be administered at the
evening medication pass and to re-check Cashner's blood pressure
by the end of the evening shift. (*Id.*) That evening, nursing
staff examined Cashner, who complained of a "bad" headache. (DE
#68-3 at 130.) Cashner's blood pressure was 192/117. (*Id.*)
Nursing staff called Dr. Al-Shami regarding Cashner's blood
pressure, and Dr. Al-Shami ordered an increase in Diltiazem (for
high blood pressure) to 120 mg twice daily, and nursing staff
administered the increased dosage immediately thereafter. (*Id.*)
Nursing staff also administered the trial dosage of Lisinopril 40
mg during the evening medication pass. (DE #68-3 at 129; DE #68-6
¶ 8.) Cashner's blood pressure decreased to 153/104 after nursing
staff administered the trial dosage of Lisinopril. (DE #68-3 at
130; DE #68-6 ¶ 8.)

On the morning of July 16, 2012, Cashner took his
medications and made no complaints of a headache. (DE #68-3 at
128.) That evening, Nurse Martin examined Cashner, who reported a
headache. (*Id.*) On July 17, 2012, Dr. Al-Shami examined Cashner,
who reported headaches. (DE #68-2 45; DE #68-6 ¶ 9.) Dr. Al-Shami
discontinued Cashner's Naprosyn and prescribed Tylenol. (*Id.*) Dr.

20

Al-Shami also determined that an outside neurology consultation was not medically necessary because Dr. Al-Shami had diagnosed Cashner with tension-related headaches (versus migraine headaches), which were manageable on Cashner's current pain medication regimen without the need for a neurology consultation. (*Id.*) In Dr. Al-Shami's medical opinion, Cashner's chronic headaches were related to his uncontrolled high blood pressure. (DE #68-6 ¶ 9.) The priority then was to get Cashner's blood pressure under better control to see if his headaches improved, before sending him for further testing and evaluation with a neurologist. (*Id.*) On July 18, 2012, Cashner reported to Nurse Walker requesting another dose of Tylenol for his headaches. (DE #68-3 at 127.) Nursing staff contacted Dr. Al-Shami, who ordered one dose of Tylenol. (*Id.*; DE 68-6 ¶ 10.) On July 19, 2012, Dr. Al-Shami ordered Atenolol to treat Cashner's high blood pressure. (DE #68-3 at 126; DE #68-6 ¶ 11.)

On July 23, 2012, Cashner submitted a Medical Request Form asking to see the doctor. (DE #68-4 at 156; DE #68-1 ¶ 20.) Nurse White responded the following day and indicated that Cashner had seen Dr. Al-Shami last week and she instructed Cashner to set forth any specific questions that he had so that Nurse White could pass those on to Dr. Al-Shami for response. (*Id.*) Nurse White later contacted Dr. Al-Shami with Cashner's complaints and Dr. Al-Shami discontinued Cashner's evening dose of Tylenol and

prescribed Tylenol once daily for 30 days because Cashner's tension headaches could be effectively managed on a single daily dose of Tylenol. (DE #68-3 at 127; DE #68-1 ¶ 20; DE #68-6 ¶ 12.) On July 29, 2012, Cashner submitted a Medical Request Form asking to see the doctor and indicating that he was still experiencing headaches. (DE #68-4 at 155; DE #68-1 ¶ 21.) Nurse White responded the following day that she would schedule a visit with Dr. Al-Shami as soon as practicable, and that Cashner had an upcoming appointment with an outside neurologist related to his headaches. (*Id.*) On July 30, 2012, Cashner submitted a Medical Request Form asking to see the doctor for his headaches and high blood pressure. (DE #68-4 at 154; DE #68-1 ¶ 22.) Nurse White responded the following day that Cashner was on the list to see the doctor and had an upcoming appointment with an outside neurologist. (*Id.*)

On August 5, 2012, Cashner submitted a Medical Request Form indicating that he was still experiencing daily headaches. (DE #68-4 at 153.) Cashner reported that his Tylenol helped to dull his headache pain in the mornings, but that his headaches worsened in the afternoon. (*Id.*) Cashner asked to see the doctor. (*Id.*) Nurse Walker responded the following day that Cashner was on the list to see the doctor and had an upcoming appointment with an outside neurologist. (*Id.*) On August 7, 2012, Dr. Al-Shami examined Cashner, where Cashner continued to report

headaches. (DE #68-2 at 53; DE #68-6 ¶ 13.) Dr. Al-Shami again diagnosed tension-related headaches, as Cashner reported daily headaches, whereas migraine headaches would only occur intermittently, not daily. (*Id.*) Dr. Al-Shami felt that Cashner's tension headaches were manageable on his current pain medication regimen. (*Id.*) On August 13, 2012, Cashner submitted a Medical Request Form asking to see the doctor and indicating that he was still experiencing headaches. (DE #68-4 at 152; DE #68-1 ¶ 23.) Cashner asserted that his medications were not controlling his headaches. (*Id.*) Nurse White responded that day that she would schedule Cashner for a visit with Dr. Al-Shami as soon as practicable and she inquired as to whether Cashner's prescribed medications worked better than Meloxicam, which had been previously prescribed and discontinued. (*Id.*)

On August 14, 2012, Dr. Al-Shami examined Cashner, where Cashner reported headaches and uncontrolled blood pressure. (DE #68-2 at 54; DE #68-6 ¶ 14.) Dr. Al-Shami added Hydralazine to Cashner's medication regimen to treat his high blood pressure. (*Id.*) On August 17, 2012, Cashner was apparently involved in an altercation with another inmate. (DE #68-2 at 55-61; DE #68-6 ¶ 15.) Nursing staff contacted Dr. Al-Shami regarding Cashner's condition and Dr. Al-Shami ordered an x-ray of Cashner's facial bones, including nasal and mandible, an x-ray of his left shoulder, an x-ray of his left hand, and Ibuprofen. (*Id.*) Dr. Al-

Shami determined that, based on the injuries reported by nursing staff to him, there was no need to send Cashner to the emergency room on that date. (DE #68-6 ¶ 15.) Cashner's x-rays were normal and showed no injuries. (*Id.*)

On August 19, 2012, Cashner indicated to Nurse Walker that he would not take his new prescription medication (Hydralazine 100 mg) because the medication gave him a headache. (DE #68-3 at 126.) On August 20, 2012, Cashner submitted a Medical Request Form indicating that he had an adverse reaction to his Hydralazine and that he could not take the medication any longer. (DE #68-4 at 151.) Cashner also indicated that his blood pressure remained high and that he still experienced headaches. (*Id.*) Cashner requested to see a provider who could control his blood pressure and headaches. (*Id.*) Nurse Walker assessed Cashner that morning in the medication pass line. (DE #68-3 at 125.) Cashner complained that his new medication (Hydralazine) caused headaches. (*Id.*) Cashner took his Hydralazine as prescribed and voiced no complaints of headaches thereafter. (*Id.*) That evening, nursing staff indicated that Cashner refused his Hydralazine, but took all other prescribed medications. (*Id.*) Cashner voiced no new complaints at that time. (*Id.*) On August 21, 2012, Nurse Martin examined Cashner and he refused his Hydralazine, but took all other prescribed medications. (*Id.*) Cashner voiced no complaints. (*Id.*) Dr. Al-Shami examined Cashner later that day,

where he reported headaches and adverse side-effects from his Hydralazine. (DE #68-2 at 69; DE #68-6 ¶ 16.) Dr. Al-Shami increased Cashner's Diltiazem to 240 mg to control his blood pressure and ordered nursing staff to check Cashner's blood pressure. (*Id.*) On August 22 and August 23, 2012, Cashner took his medications and voiced no complaints. (DE #68-3 at 125.) On August 24, 2012, Nurse Walker examined Cashner. (*Id.*) Cashner took his medications and voiced no complaints. (*Id.*) Nurse Walker indicated that Cashner would be transferred out of medical isolation that day. (*Id.*) On August 26, 2012, Cashner took his medications and voiced no complaints. (*Id.*) On August 27, 2012, nursing staff examined Cashner. (*Id.*) Cashner took his medications and reported continual headaches (*Id.*) Cashner also expressed that he enjoyed his new housing pod. (*Id.*) That evening, Nurse Martin examined Cashner. (*Id.*) Cashner took his medications and voiced no complaints. (*Id.*) On August 28, 2012, Nurse Martin examined Cashner. (*Id.*) Cashner took his medications and voiced no complaints. (*Id.*)

On August 30, 2012, jail staff was able to transport Cashner to Dr. Vyas' office. (DE #65-2 ¶13.) Neurologist Daksha Vyas, M.D. evaluated Cashner during this outside consultation. (DE #68-7.) This appointment had been previously scheduled by Nurse White and ordered by Dr. Harmston, Dr. Al-Shami's predecessor at the Porter County Jail, prior to Dr. Al-Shami's involvement in

Cashner's medical care. (DE #68-6 ¶ 17.) Even though Dr. Al-Shami did not think this evaluation was necessary, Dr. Al-Shami saw no harm in permitting Cashner to go to a previously-scheduled appointment. (*Id.*) At the consultation, Cashner reported that his headaches started approximately 1 year prior and that he experienced them daily since that time. (DE #68-7 at 1-5.) Cashner also indicated that his headaches were located behind his eyes and in the back of his head and that he had blurred vision during his headache episodes. (*Id.*) Cashner conveyed that medical staff at the Porter County Jail had prescribed Naprosyn, but that this medication raised his blood pressure. (*Id.*) Cashner also expressed that Fioricet and Flexeril had provided headache relief in the past. (*Id.*) Cashner indicated that he was currently taking Tylenol, which only provided minimal relief. (*Id.*) Dr. Vyas conducted a neurological exam and physical exam, which were both completely normal. (DE #68-7 at 2-4; DE #68-6 ¶ 17.) Dr. Vyas did note tenderness in Cashner's cervical para-spinal muscles and documented Cashner's previous cervical spine fusion surgery. (DE #68-7 at 1, 3.) Dr. Vyas ordered labs (Free T4, TSH, ANA Titer, Sed Rate), an MRI of Cashner's brain, an x-ray of his cervical spine, and an EEG. (DE #68-7 at 4.) Dr. Vyas prescribed Ultram 50 mg 3 times daily for 30 days. (*Id.*) The following day, Dr. Al-Shami prescribed Ultram 50 mg three times daily for 30 days and discontinued Cashner's Tylenol and/or Ibuprofen orders, as those

medications were no longer necessary to treat Cashner's pain given his prescription for Ultram. (DE #68-2 at 73, 76; DE #68-6 ¶ 18.)

On September 3, 2012, Cashner submitted a Medical Request Form inquiring as to why he had not received his prescription for Flexeril twice daily as ordered by Dr. Vyas on August 30, 2012. (DE #68-3 at 150.) Nurse Walker responded the following day and indicated that no such prescription had been written by Dr. Vyas, other than what had already been ordered by Dr. Al-Shami. (*Id.*) On September 4, 2012, Dr. Al-Shami ordered all labs for Mr. Cashner, as recommended by Dr. Vyas. (DE #68-3 at 81; DE #68-6 ¶ 19.)

Cashner alleges that while Nurse White was drawing blood for his lab work on September 4, 2012, Dr. Al-Shami entered the room. (DE #70-2 ¶ 13.) Dr. Al-Shami grabbed Cashner's chart and stated that "he had traveled the world treating patients," and "he was a better doctor than any neurologist," and "he wasn't going to let any other doctor tell him how to treat a patient of his." (*Id.* at ¶ 13.) Cashner says that Dr. Al-Shami informed him that he would not be going back to see Dr. Vyas. (*Id.*) According to Cashner, Dr. Al-Shami continued by saying that "his headaches were all in my head," and stated that he would no longer treat Cashner for his chronic headaches. (*Id.* at ¶¶ 15, 16.) On that same date, Dr. Al-Shami informed Cashner that "an MRI was a very expensive

27

procedure and was too expensive for me to have at the Jail's expense." (*Id.* at ¶ 17.) Later that same day, Cashner claims he was called into Warden Widup's office and was again told that an MRI was too expensive. (*Id.* at ¶ 18.)

On September 5, 2012, Dr. Al-Shami reviewed Cashner's lab results, all of which were normal. (DE #68-6 ¶ 20.) Cashner's normal lab results solidified Dr. Al-Shami's opinion that his headaches were related to high blood pressure and Dr. Al-Shami did not think an MRI or neurology follow-up were necessary. (*Id.*) Cashner submitted a Medical Request Form inquiring as to who had cancelled his prescription for Ultram and the reason for the cancellation. (DE #68-3 at 149; DE #68-1 ¶ 24.) Nurse White responded the following day and indicated that the jail doctor had deemed Cashner's prescription for Ultram unnecessary based upon Cashner's normal lab results and normal physical and neurological exams. (*Id.*) On September 7, 2012, Nurse Walker spoke with Cashner regarding medication renewal. (DE #68-3 at 124.) Cashner indicated that he was stable and wished to continue his medications as prescribed. (*Id.*) Dr. Al-Shami renewed Cashner's Lisinopril. (DE #68-3 at 124; DE #68-6 ¶ 21.) By way of a note dated September 7, 2012, Nurse White informed Cashner that Dr. Al-Shami had deemed his appointment with Dr. Vyas on September 13, 2012 unnecessary because of his normal lab work and physical exam. (DE #68-3 at 82; DE #68-1 ¶ 25.) Dr. Al-Shami had

28

reviewed all of Cashner's labs (as recommended by Dr. Vyas) on
September 5, 2012, and all labs were normal, thus negating the
need for an MRI of Cashner's brain and/or follow up with Dr.
Vyas. (DE #68-3 at 81.) Cashner's normal lab results solidified
Dr. Al-Shami's opinion that his headaches were related to his
high blood pressure. (DE #68-6 ¶ 34.) Dr. Al-Shami, therefore,
did not think that an MRI of Mr. Cashner's brain or a neurology
follow-up consultation was necessary. (*Id.*)

On September 13, 2012, Nurse White and Warden Widup met with
Cashner to discuss his chronic headaches and available treatments
and medications. (DE #68-3 at 123; DE #68-1 ¶ 26; DE #68-6 ¶ 22;
DE #65-2 ¶ 10.) Cashner indicated that Tylenol and Ibuprofen
provided no relief for his headaches. (*Id.*) Nurse White and
Warden Widup consulted with Dr. Al-Shami, who ordered a trial
prescription of Topamax, as well as daily blood pressure checks.
(*Id.*; DE #65-2 ¶ 10) Topamax is used to treat severe headaches.
(DE #68-6 ¶ 22.) On September 25, 2012, Dr. Al-Shami examined
Cashner. (DE #68-3 at 83; DE #68-6 ¶ 23.) Dr. Al-Shami noted no
neurological deficits, but observed that Cashner's blood pressure
was still too high and explained and discussed his concerns with
Cashner. (*Id.*)

On October 11, 2012, Cashner filed a Motion to Compel
Medical Records and Medical Treatment in the Porter County
Superior Court as part of his criminal case. (DE #68-3 at 84-87.)

Cashner requested an order from the Porter County Superior Court directing medical staff at the Porter County Jail to schedule an MRI of Cashner's brain; schedule a follow-up visit with Dr. Vyas; provide the medications prescribed by Dr. Vyas; and to provide a copy of all of Cashner's medical records to his attorney. (*Id.*) On October 16, 2012, Dr. Al-Shami ordered Topamax for Cashner's headaches. (DE #68-3 at 122; DE #68-6 ¶ 24.) On October 20, 2012, Cashner complained to Nurse Walker of a headache during the medication pass line. (DE #68-3 at 122; DE #68-6 ¶ 25.) Nurse Walker notified Dr. Al-Shami, who ordered nursing staff to start Cashner's Topamax prescription for his headaches. (*Id.*) On October 27, 2012, Nurse Martin examined Cashner. (*Id.*) Cashner voiced no complaints of a headache. (*Id.*) On October 29, 2012, Nurse Walker examined Cashner in the morning while Nurse Martin did so in the evening. (*Id.*) Cashner voiced no complaints during either visit and took his medications as prescribed. (*Id.*) Also on October 29, 2012, the Porter County Superior Court issued an Order granting Cashner's Motion to Compel, which directed the Porter County Jail to schedule a follow-up appointment with Dr. Vyas within 15 days of the date of the Order, but that the appointment date did not have to be within 15 days. (DE #68-3 at 88; DE #68-1, Ex. 1.) On October 30, 2012, nursing staff examined Cashner. (DE #68-3 at 122.) Cashner voiced no complaints, but stated, "I have a surprise for the medical department." (*Id.*)

Cashner took his medications as prescribed. (*Id.*) That evening,
Nurse Martin assessed Cashner. (*Id.*) Cashner voiced no complaints
and took his medications as prescribed. (*Id.*) On October 31,
2012, Cashner voiced no complaints to either the morning shift or
evening shift nurses. (DE #68-3 at 121, 122.)

On November 2, 2012, Nurse White scheduled Cashner for a
follow-up appointment with Dr. Vyas on December 6, 2012 at 3:15
p.m., in compliance with the criminal court's order. (DE #68-3 at
88; DE #68-1 ¶¶ 27, 32.) From November 2, 2012 to November 4,
2012, Cashner voiced no complaints of headaches and took his
medications as prescribed. (DE #68-3 at 121.) On the morning of
November 6, 2012, Nurse Walker assessed Cashner, who reported a
headache. (*Id.*) Cashner took his medications as prescribed,
including his Topamax. (*Id.*) That evening, Nurse Martin assessed
Cashner, who voiced no complaints and took his medications as
prescribed. (*Id.*) On November 7 and November 8, 2012, Cashner
voiced no complaints of headaches. (*Id.*) On the morning of
November 9, 2012, Nurse Walker assessed Cashner. (*Id.*) Cashner
indicated that he had been awakened in the middle of the night
with a headache, but that he did not have a headache at that
time. (*Id.*) That evening, nursing staff assessed Cashner, who
voiced no complaints. (DE #68-3 at 120.) From November 10, 2012
to November 18, 2012, Cashner voiced no complaints of headaches.
(DE #68-3 at 119-121.) On November 18, 2012, Cashner reported to

nursing staff that he felt "much better" than he did the prior
Thursday. (DE #68-3 at 119.) On the morning of November 19, 2012,
nursing staff assessed Cashner, who reported a "bad" headache.
(*Id.*) Cashner also indicated that he had taken pain medications
he had purchased from the commissary prior to evaluation.(*Id.*)
Nursing staff administered Cashner's prescribed medications and
returned him to his housing unit. (*Id.*) On the morning of
November 20, 2012, Nurse Walker assessed Cashner. (*Id.*) Cashner
took his medications as prescribed and voiced no complaints.
(*Id.*) That evening, nursing staff assessed Cashner. (*Id.*) Cashner
reported that he was still experiencing the same headache from
the day before, but that its severity had subsided. (*Id.*) Nursing
staff advised Cashner to continue taking pain relievers purchased
from the commissary and to take a hot shower and meditate to try
to relax and relieve any possible stress. (*Id.*) On the morning of
November 21, 2012, Nurse Walker assessed Cashner. (*Id.*) Cashner
voiced no complaints. (*Id.*) That evening, Nurse Martin assessed
Cashner. (*Id.*) Nurse Martin offered to request a renewal of
Cashner's Topamax, but Cashner declined. (*Id.*) Cashner indicated
that he wanted Toradol, which he alleged was Court-ordered. (*Id.*)
Cashner voiced no other complaints and took his medications as
prescribed. (*Id.*)

On November 22, 2012, Cashner submitted a Medical Request
Form asking for a prescription for Ultram, which he alleged was

Court-ordered. (DE #68-3 at 147; DE #68-1 ¶ 28.) Nurse White responded on November 26, 2012 and placed Cashner on the list to see Dr. Al-Shami. (*Id.*) From November 23, 2012 to November 25, 2012, Cashner voiced no complaints. (DE #68-3 at 118-119.) On November 25, 2012, Nurse Walker administered Cashner's medications prior to his going to Court that day. (DE #68-3 at 118.) Cashner voiced no complaints. (*Id.*) Upon his return from Court, nursing staff assessed Cashner and noted that his blood pressure was elevated. (*Id.*) Cashner indicated that his elevated blood pressure was likely due to his stressful day in Court. (*Id.*) Cashner voiced no complaints of a headache. (*Id.*) On November 27, 2012, Cashner voiced no complaints of headaches. (*Id.*) On November 28, 2012, Dr. Al-Shami examined Cashner and Cashner reported headaches. (DE #68-3 at 90; DE #68-6 ¶ 26.) Dr. Al-Shami advised Cashner to continue purchasing Tylenol from the commissary for his headaches. (*Id.*) Dr. Al-Shami also prescribed Ultram 50 mg twice daily. (*Id.*) Dr. Al-Shami requested a consultation with an outside neurologist regarding Cashner's headaches, pursuant to a Court Order dated October 29, 2012. (*Id.*) He and Nurse White then discussed the Court Order and that they were in compliance with it, because Cashner was already scheduled on November 2, 2012, for an appointment on December 6, 2012, which was within 15 days of the court order. (DE #68-1 ¶ 29, Ex. 1.) On November 29, 2012, Cashner voiced no complaints of

a headache. (DE #68-3 at 118.) On November 30, 2012, Dr. Al-Shami reviewed Cashner's blood pressure records and ordered weekly blood pressure checks. (*Id.;* DE #68-6 ¶ 27.)

On December 1, 2012, Mr. Cashner voiced no complaints of a headache.(DE #68-3 at 118.) On December 2, 2012, nursing staff assessed Cashner, who indicated that he was still having headaches. (*Id.*) On the morning of December 3, 2012, nursing staff assessed Cashner. (*Id.*) Cashner inquired as to why he had not yet received his Ultram prescription. (*Id.*) That evening, Cashner again inquired as to why he had not yet received his Ultram prescription. (*Id.*) Cashner voiced no other complaints. (*Id.*) On the evening of December 4, 2012, nursing staff assessed Cashner. (DE #68-3 at 117.) Cashner again inquired as to why he had not yet received his Ultram prescription. (*Id.*) Cashner voiced no other complaints. (*Id.*) On December 5, 2012, Cashner voiced no complaints of a headache. (*Id.*)

On December 6, 2012, Dr. Vyas examined Cashner during his second outside neurology consultation. (DE #68-7 at 6-10.) Dr. Vyas indicated that Cashner took Tylenol and Motrin for his headaches, which provided inconsistent relief. (*Id.* at 6.) Dr. Vyas also noted that Cashner's Topamax prescription had at least partially alleviated his headaches. (*Id.*) Dr. Vyas noted that Cashner had chronic headaches since June of 2011. (*Id.*) Dr. Vyas performed a physical exam and neurological exam, which were both

normal. (*Id.* at 7-9.) Dr. Vyas ordered an MRI of Cashner's brain and prescribed Ultram 50 mg three 3 times daily and Flexeril 10 mg at bedtime. (*Id.* at 9.) Dr. Vyas instructed Cashner to follow up in six weeks. (*Id.*) That evening, Dr. Al-Shami ordered Ultram 50 mg once daily for 60 days and Flexeril 10 mg once daily for 60 days. (DE #68-3 at 93, 117; DE #68-6 ¶ 28.) Nursing staff informed Dr. Al-Shami that the medications were not in stock at the Porter County Jail, and Dr. Al-Shami submitted an emergency order through Diamond Pharmacy for the medications. (*Id.*)

On December 8, 2012, Nurse Martin assessed Cashner. (DE #68-3 at 117.) Nurse Martin explained to Cashner that, due to the nature of his newly-ordered medications (Ultram and Flexeril), he would need to be moved to medical isolation to take these medications. (*Id.*) Cashner expressed his understanding and refused to move to medical isolation. (*Id.*; DE #68-6 ¶ 29.) Cashner indicated that he would discuss the issue with his attorney, the Medical Director and Warden Widup. (*Id.*) Cashner voiced no other complaints. (*Id.*) On December 9, 2012, Cashner submitted a Medical Request Form asking to speak with Nurse White regarding his newly-prescribed medications and why the medications could only be taken in medical isolation. (DE #68-3 at 146.) Nurse Walker responded the following day that Warden Widup was in charge of this decision and that medical staff played no role in the decision. (*Id.*) On the evening of December

9, 2012, Cashner refused to move to medical isolation to take his Ultram and Flexeril. (*Id.* at 116; DE #68-6 ¶ 30.) Medical and administrative staff at the Porter County Jail preferred that inmates on medications such as Ultram and Flexeril were housed in medical isolation, rather than general population, to reduce the risk of medication hoarding and trafficking, which is common in the jail setting. (DE #68-6 ¶ 30.)

On December 10, 2012, Cashner took his medications as prescribed, including his Ultram and Flexeril. (DE #68-3 at 116.) That same day, Nurse White and Warden Widup met with Cashner pursuant to his December 9th request. (*Id.* at 115; DE #68-1 ¶ 30; DE #65-2 ¶ 11.) Cashner agreed to take his medications as ordered, so long as the medications were crushed. (*Id.*) Nurse White and Warden Widup agreed and indicated that Cashner could remain in general population at that time. (*Id.*) Dr. Al-Shami indicated by telephone order that nursing staff could crush Cashner's Ultram and Flexeril to be administered in general population. (DE #68-3 at 115; DE #68-6 ¶ 31.) After December 10, 2012, Cashner took his medications and made few complaints of headaches. (DE #68-6 ¶ 32.) Nursing staff did not contact Dr. Al-Shami again regarding Cashner. (*Id.*) On the evening of December 11, 2012, nursing staff assessed Cashner, who indicated that he was doing much better. (*Id.*) From December 12, 2012 to December 23, 2012, Cashner voiced no complaints of headaches. (DE #68-3 at

114-15.) On the morning of December 24, 2012, nursing staff assessed Cashner. (*Id.* at 114.) Cashner indicated that he was still experiencing headaches, but that his headaches were shorter in duration and less intense with his new medications. (*Id.*)

Nurse Kim White stopped working for ACH on December 31, 2012, and also stopped working at the Porter County Jail at that time. (DE #68-1 ¶ 5.) She had no further involvement with Cashner's medical care after this date. (*Id.*) From December 25, 2012 to January 23, 2013, Cashner voiced no complaints of headaches. (DE #68-3 at 110-114.) On January 24, 2013, Cashner transferred to the Indiana Department of Correction. (*Id.* at 110.)

Dr. Al-Shami has over 35 years of experience treating patients in both the private practice and the correctional settings. (DE #68-6 ¶ 34.) He has training and professional experience treating various chronic conditions, including chronic headaches such as those experienced by Cashner. (*Id.*) In his treatment of Cashner, Dr. Al-Shami based his diagnoses and treatment decisions on Cashner's subjective complaints, objective conditions, and his medical judgment. (*Id.*) Cashner reported daily headaches, which led Dr. Al-Shami to conclude that he was experiencing tension-related headaches, which could be treated and/or managed with over-the-counter pain medications. (*Id.*) Cashner also had significantly elevated blood pressures, which

Dr. Al-Shami believed was likely causing his headaches. (*Id.*) In Dr. Al-Shami's opinion, if Cashner had been experiencing migraine headaches, he would not experience the daily, mild headaches that he in fact reported, but would rather experience more severe headaches of lesser frequency. (*Id.*) Dr. Al-Shami only prescribed pain medications that he believed would best treat Mr. Cashner's headaches and pain. (*Id.*)

Dr. Al-Shami believes that the medical care rendered to Mr. Cashner by the medical staff at the Porter County Jail, including Dr. Al-Shami and the nurses, was reasonable, appropriate, and within the applicable standard of care. (*Id.* at ¶ 37.) Dr. Al-Shami's treatment decisions regarding Cashner were not based on any policy, practice, procedure or custom of ACH or the Porter County Jail. (*Id.* at ¶ 38.) Dr. Al-Shami states that his treatment decisions regarding Cashner had nothing to do with cost or monetary concerns; he prescribes whatever medication or treatment he thinks is appropriate, regardless of cost. (*Id.*) Dr. Al-Shami does not even know whether the Porter County Jail or ACH paid for inmates' medical care, because cost was never a concern to him. (*Id.*) Likewise, Nurse White states that The medical care rendered by her and the nursing staff at the jail was reasonable, appropriate, and within the applicable standard of nursing care. (*Id.* at ¶ 38.)

While Warden Widup only had three in-person meetings with Cashner, he still remained informed on his medical condition. (DE #65-2 ¶¶ 16, 17, 23.) Warden Widup knew that Dr. Al-Shami had diagnosed Cashner with having tension headaches that were brought on by high blood pressure. (*Id.* at ¶¶ 17, 18.) Warden Widup was kept informed on Cashner's medical issues, including his diagnoses, courses of medication, and Cashner's hesitance to take certain medications that would require him to be housed in medical isolation due to jail policy. (*Id.* at ¶¶ 18, 20, 23.)

DISCUSSION

A. <u>Federal Deliberate Indifference Claims</u>

As a preliminary matter, because Cashner was a pretrial detainee when these events occurred, the Fourteenth rather than the Eighth Amendment applies. *Lewis v. Downey*, 581 F.3d 467, 473 (7th Cir. 2009). The governing standards are functionally equivalent, however, and "anything that would violate the Eighth Amendment would also violate the Fourteenth Amendment." *Id.*

To establish liability under the Eighth Amendment, a prisoner must show: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to his medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994.) A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious that

even a lay person would easily recognize the necessity for a
doctor's attention, and if untreated could result in further
significant injury or unnecessary pain, and that significantly
affects the person's daily activities or features chronic and
substantial pain. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir.
2005). Deliberate indifference is a high standard, and is
"something approaching a total unconcern for a prisoner's welfare
in the face of serious risks," or a "conscious, culpable refusal"
to prevent harm. *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir.
1992). As the Seventh Circuit has explained:

> [C]onduct is deliberately indifferent when the official
> has acted in an intentional or criminally reckless
> manner, i.e., the defendant must have known that the
> plaintiff was at serious risk of being harmed and
> decided not to do anything to prevent that harm from
> occurring even though he could have easily done so.

*Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005).

For a medical professional to be held liable for deliberate
indifference to an inmate's medical needs, he must make a
decision that represents "such a substantial departure from
accepted professional judgment, practice, or standards, as to
demonstrate that the person responsible actually did not base the
decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688,
697 (7th Cir. 2008). As the Seventh Circuit has explained:

> [M]edical professionals are not required to provide
> proper medical treatment to prisoners, but rather they
> must provide medical treatment that reflects
> professional judgment, practice, or standards. There is
> not one proper way to practice medicine in a prison,

but rather a range of acceptable courses based on
prevailing standards in the field. A medical
professional's treatment decisions will be accorded
deference unless no minimally competent professional
would have so responded under those circumstances.

*Id.* at 697-698. Negligence, incompetence, or even medical
malpractice do not amount to deliberate indifference. *Pierson v.
Hartley*, 391 F.3d 898, 902 (7th Cir. 2004); *Walker v. Peters*, 233
F.3d 494, 499 (7th Cir. 2000).

Furthermore, a prisoner is not entitled to demand specific
care, nor is he entitled to the "best care possible." *Forbes v.
Edgar*, 112 F.3d 262, 267 (7th Cir.1997). Where the defendants
have provided some level of care for a prisoner's medical
condition, in order to establish deliberate indifference the
prisoner must show that "the defendants' responses to [his
condition] were so plainly inappropriate as to permit the
inference that the defendants intentionally or recklessly
disregarded his needs." *Hayes v. Synder*, 546 F.3d 516, 524 (7th
Cir. 2008). A mere disagreement with medical professionals about
the appropriate treatment does not amount to an Eighth Amendment
violation. *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir.
2003).

    1.   Dr. Al-Shami was not deliberately
        indifferent to Cashner's medical condition

Cashner was granted leave to proceed on his allegations that
Dr. Al-Shami was dismissive of his chronic headaches and refused
to provide him with effective medical treatment and testing. To

survive summary judgment on his theory that Dr. Al-Shami denied him constitutionally adequate treatment, Cashner needed to present evidence that "no minimally competent" doctor would have chosen that course of treatment. *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008). This he has not done.

Cashner argues that Dr. Al-Shami's decision not to follow Dr. Vyas' recommendation to get an MRI constituted deliberate indifference. As a threshold matter, the mere fact that Dr. Al-Shami had a difference of opinion with Dr. Vyas's recommendation does not give rise to deliberate indifference. Indeed, questions of whether certain diagnostic tests are warranted are "a classic example of a matter for medical judgment." *Estate of Cole ex. rel. Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996) (quotation omitted). Similarly, Cashner's desire for an MRI does not establish an Eighth Amendment violation, as a prisoner "is not entitled to demand specific care." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) (stating that a prisoner "is not entitled to the best care possible"); *see also Kendrick v. Frank*, 310 F. App'x 34, 38 (7th Cir. 2009) (stating that there is not "a constitutional right to demand either a particular type of medical treatment or a certain specialist" (*citing Forbes*, 112 F.3d at 267)).

Certainly, though, a decision to ignore a specialist's orders can raise an inference of deliberate indifference. *Gil v.*

*Reed*, 381 F.3d 649, 662-64 (7th Cir. 2004). To do this, a plaintiff must present sufficient facts to create a genuine issue about the doctor's state of mind in refusing to follow the specialist's advice. *Id.* at 663. Cashner has presented no evidence to raise such an inference here. Cashner attempts to argue that Dr. Al-Shami refused to have him undergo an MRI out of cost containment concerns. Considering the extensive medical treatment the jail provided to Cashner during 2011 and 2012, it is hard to fathom that he would be denied one diagnostic test based on cost. Indeed, none of the defendants testified that money was ever an issue in treating Cashner. Notably, Dr. Al-Shami stated that he did not even know whether his employer or the Porter County Sheriff's Department paid for inmates' medical care.

Nevertheless, Cashner believes that his September 4, 2012 conversation with Dr. Al-Shami shows that he was denied an MRI because of cost. The Court disagrees. On this day, Cashner says Dr. Al-Shami told him that there was nothing wrong with him and his "headaches were all in his head." (DE #70-2 ¶ 15.) Dr. Al-Shami went on to say that "he wasn't going to let any other doctor tell him how to treat a patient of his," and explained that Cashner "would not be going back to see Dr. Vyas. . . .." (*Id.* at ¶¶ 13, 14.) Dr. Al-Shami further stated "that an MRI was

a very expensive procedure and was too expensive for me to have at the Jail's expense." (*Id.* at ¶ 17.)

It would be unreasonable for the court to consider Dr. Al-Shami's last comment in isolation to infer that Dr. Al-Shami was denying a medically necessary diagnostic test in order to save money. Indeed, Dr. Al-Shami never says that he is refusing to order a necessary MRI based on cost. To the contrary, the conversation reveals that Dr. Al-Shami did not believe Cashner needed an MRI and was not going to order one just because Dr. Vyas recommended it. There is nothing wrong with Dr. Al-Shami telling Cashner that an MRI is too expensive of a procedure for the jail to pay for since it was unnecessary.

The undisputed facts are that Dr. Al-Shami did not believe that either a follow-up appointment with Dr. Vyas or an MRI was medically necessary. Again, the September 4, 2012, conversation illustrates that Dr. Al-Shami did not believe an MRI was necessary and would not order one just because Dr. Vyas recommended it. This is reinforced in Dr. Al-Shami's affidavit, where he explained that his decision to forego the recommended MRI was based on his conclusion that Cashner's condition and test results did not warrant an MRI. He decided not to order the testing after lab results confirmed his belief that Cashner was suffering from tension related headaches caused by uncontrolled blood pressure. Ultimately, there is no evidence that would allow

a reasonable fact-finder to infer that Dr. Al-Shami's decisions were based on anything other than medical judgment. *See e.g. Zackery v. Mesrobian*, 299 Fed. Appx. 598, 601, 602 (7th Cir. 2008) (finding no deliberate indifference and granting summary judgment in favor of jail doctor who used his own medical judgment in rejecting specialist's recommendations).

Next, Cashner complains that on September 4, 2012, Dr. Al-Shami told him that he would no longer treat Cashner's headaches. Even if Dr. Al-Shami made such a statement, that statement itself while unprofessional, would not violate the constitution. *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000). And, whether Dr. Al-Shami made those statements is immaterial. The undisputed facts and medical records show that Dr. Al-Shami continued to treat Cashner on numerous occasions beyond September 4, 2012.

Upon review, Dr. Al-Shami was Cashner's primary care provider from June 2012 to December 2012. In those six months, the medical records show that Dr. Al-Shami personally met with and examined Cashner six times. In addition, Dr. Al-Shami issued telephone orders on 17 different occasions to assist Cashner with his health concerns. The records reflect Dr. Al-Shami met regularly with Cashner, prescribed him various medications, and monitored his condition in an effort to get his headaches and blood pressure under control. The records also establish that Dr. Al-Shami would change medications and treatments when they proved

ineffective. It is clear that Dr. Al-Shami diligently worked with Cashner to alleviate his headache problems. While Cashner apparently may not have agreed with all aspects of Dr. Al-Shami's treatment, dissatisfaction with a doctor's chosen course of treatment – even when it is negligent – is insufficient to establish deliberate indifference. *Estelle*, 429 U.S. at 107. In light of the totality of care Dr. Al-Shami provided, a reasonable fact-finder could not construe his actions as deliberate indifference. *Walker*, 233 F.3d at 501. The Court recognizes there is not one appropriate way to practice medicine in a prison, but rather a range of acceptable courses of action based on prevailing standards in the field. *See Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) ("[T]he Constitution is not a medical code that mandates specific medical treatment."); *see also Estelle v. Gamble*, 429 U.S. 97, 107 (1976). Because the record is devoid of any evidence that Dr. Al-Shami acted deliberately indifferent to Cashner's medical condition, summary judgment on his behalf is appropriate.

2.  Nurse White was not deliberately
    indifferent to Cashner's medical condition

Cashner was granted leave to proceed on his allegations that Nurse White delayed him being treated by a neurologist by failing to arrange for him to be transported to his June 28 and September 13, 2012, appointments with Dr. Vyas. (DE ##1, 5.) However, the

undisputed facts show that Nurse White did not cause any delays.
Cashner was not transported to an appointment with Dr. Vyas on
June 28, 2012, due to a worker shortage at the jail along with an
emergency situation that arose on that day. And, Cashner's
September 13, 2012, appointment was cancelled by Dr. Al-Shami
because he did not find it medically necessary. Thus, Nurse White
was not involved in delaying Cashner's neurologist appointments.
The reasons why Cashner was not transported those two
appointments with Dr. Vyas were beyond her control and there is
no evidence that she was deliberately indifferent to Cashner's
condition. In his response, Cashner does not argue to the
contrary. (*See* DE 70.) Thus, Nurse White is entitled to summary
judgment as well.

> 3.  Warden Widup was not deliberately
>     <u>indifferent to Cashner's medical condition</u>

Cashner was granted leave to proceed on his allegations that
Warden Widup delayed him being treated by a neurologist by
failing to arrange for him to be transported to his June 28 and
September 13, 2012, appointments with Dr. Vyas. (DE ##1, 5.)
However, as explained above, Warden Widup played no role in
Cashner not being transported to Dr. Vyas' office on those dates.
Thus, he cannot be held liable. *Burks v. Raemisch*, 555 F.3d 592,
596 (7th Cir. 2009).

Cashner was also granted leave to proceed on his allegations that Warden Widup cancelled the treatment and procedures ordered by Dr. Harmston due to monetary concerns. Cashner claims that on September 4, 2012, Warden Widup stated that "an MRI was too expensive for the jail to pay for." (DE #70-2 at 3.) However, the undisputed evidence reveals that Warden Widup had no personal involvement in the decisions involving Cashner's medical care. Though Cashner does not like it, the law encourages non-medical staff to defer to the judgment of medical personnel. *See Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010). Thus, regardless of Warden Widup's opinion of how costly an MRI was, it was entirely reasonable and proper for Warden Widup to defer to the medical personnel's decision regarding Cashner's health care in this case. *Vance v. Peters*, 97 F.3d 987 (7th Cir. 1996). There is no evidence that Warden Widup instructed any jail staff to deny Cashner any necessary medical treatment. Nor is there any evidence that Warden Widup knew Cashner was being denied any necessary medical treatment. Consequently, Warden Widup is entitled to summary judgment.

B. <u>State Medical Malpractice Claims</u>

Finally, as all of his federal claims have been dismissed, this Court declines supplemental jurisdiction over Cashner's remaining state law claims. *Cady v. South Suburban College*, 152

Fed. Appx. 531, 534 (7th Cir. 2005); *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999). Accordingly, Cashner's state law claims are dismissed without prejudice.

CONCLUSION

For these reasons, the Court:

(1) **GRANTS** the defendants' motions for summary judgment (DE ##64, 66);

(2) **DISMISSES with prejudice** Plaintiff's federal claims;

(3) **DISMISSES without prejudice** Plaintiff's state law claims; and

(4) **ORDERS** the clerk to enter judgment in favor of the defendants consistent with this order and close this case.

DATED: December 21, 2016          /s/ RUDY LOZANO, Judge
                                  United States District Court